

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-12-00643-CR

DONOVAN DARREN
LEVOY MEADOWS

APPELLANT

V.

THE STATE OF TEXAS

STATE

------------

## FROM THE 89TH DISTRICT COURT OF WICHITA COUNTY

------------

## MEMORANDUM OPINION[1]

------------

## I. Introduction

A jury convicted Appellant Donovan Darren Levoy Meadows of two counts of aggravated robbery and assessed his punishment at seventy-five years' confinement on each count. In a single point, Meadows argues that the trial court abused its discretion by allowing the State to cross-examine him during the guilt-innocence phase of trial with evidence of three felony theft convictions that

---

[1]*See* Tex. R. App. P. 47.4.

were more than ten years old and a misdemeanor conviction that was not a crime involving moral turpitude. We affirm.

## II. Discussion

Prior to cross-examination and outside of the jury's presence, the State announced its intent to question Meadows about his convictions for theft by receiving and grand larceny in the early 1990s[2] and his 1996 conviction for theft of property $20,000 to $100,000; his two 1998 misdemeanor "assault on female" convictions and his 2007 failure-to-identify conviction as crimes involving moral turpitude; and his 2009 assault-family violence conviction to impeach Meadows's statement during his direct examination that he would never harm anybody. When Meadows objected that the prior felony convictions exceeded the ten-year time limit, the State responded that the ten-year test did not apply when there were intervening crimes of moral turpitude. The trial court acknowledged that most of the convictions were beyond ten years but found "that in the interest of justice, the probative value of the conviction[s] and supported by the specific facts and circumstances outweighs the prejudicial effect." The trial court agreed that the assault-family violence conviction could be used because Meadows had opened the door by suggesting that he would never hurt anyone.

---

[2]In 1990, Meadows was convicted of theft by receiving. He received probation for his grand larceny conviction, but his probation was revoked in 1991.

## A. Standard of Review

We review a trial court's admission of evidence for an abuse of discretion, and wide discretion is afforded to the trial court. *Theus v. State*, 845 S.W.2d 874, 881 (Tex. Crim. App. 1992). Only if the trial court's decision falls outside the "zone of reasonable disagreement" has it abused its discretion. *Id.*; *Miller v. State*, 196 S.W.3d 256, 267 (Tex. App.—Fort Worth 2006, pet. ref'd).

## B. Tacking

Whether to admit remote convictions lies within the trial court's discretion and depends on the facts and circumstances of each case. *Jackson v. State*, 50 S.W.3d 579, 591 (Tex. App.—Fort Worth 2001, pet. ref'd). If more than ten years have elapsed, a prior conviction will not be held remote if the witness's lack of reformation is shown by evidence of an intervening conviction for a felony or a misdemeanor involving moral turpitude. *Id.* Misdemeanor assault on a female is a crime of moral turpitude. *Id.* at 592. The crime of failure to identify that involves lying to a police officer is a crime of moral turpitude because it involves dishonesty.[3] *Robertson v. State*, 685 S.W.2d 488, 492 (Tex. App.—Fort Worth 1985, no pet.).

Meadows argues that the admission of his prior convictions allowed his impeachment "merely for being a criminal generally" and asks that we revisit *Jackson* with regard to the "tacking" of felony convictions that are out-of-date

---

[3]Meadows admitted that he had pleaded guilty to intentionally giving a false or fictitious name to a police officer.

3

under rule of evidence 609.  *See* 50 S.W.3d at 591.  However, as we recently reiterated, "[T]his court has recognized the court of criminal appeals'[s] exception to rule 609's prohibition of remote convictions when an intervening conviction shows that the convicted person has not reformed the behavior that led to the prior convictions."  *Celis v. State*, 369 S.W.3d 691, 695 (Tex. App.—Fort Worth 2012, pet. ref'd) (citing *Jackson*, 50 S.W.3d at 591).  We decline Meadows's invitation to revisit *Jackson*, and we overrule this portion of his sole point.

Meadows further argues that the trial court abused its discretion by admitting the out-of-date felony theft convictions because it improperly applied the balancing test under rule 609(b) by failing to find that the probative value of the convictions "substantially" outweighed their prejudicial effect.  However, as we noted in *Celis*, under the tacking doctrine that this court continues to follow, "a trial court must determine whether the probative value of the convictions outweighs their prejudicial effect," which is the test under rule 609(a), not rule 609(b).  *See id.*; *see also Jackson*, 50 S.W.3d at 592 (explaining that subsequent misdemeanor convictions involving moral turpitude remove the taint of remoteness from out-of-date convictions and place them under the rule 609(a) standard).  Therefore, we overrule this portion of Meadows's sole point as well.

Meadows also contends that his substantial rights were affected because the introduction of his convictions showed that he had a lengthy criminal history with a "propensity to commit felony crimes."  However, before we reach whether Meadows was harmed by the admission of the felony convictions, we must

review whether the record supports the trial court's determination that their probative value outweighed their prejudicial effect. *See* Tex. R. Evid. 609(a); *Jackson*, 50 S.W.3d at 592.

A nonexclusive list of factors to consider in weighing the probative value of a conviction against its prejudicial effect includes (1) the past crime's impeachment value, (2) the past crime's temporal proximity relative to the charged offense and the witness's subsequent history, (3) the similarity between the past crime and the offense being prosecuted, (4) the importance of the defendant's testimony, and (5) the importance of the credibility issue. *Theus*, 845 S.W.2d at 880. The impeachment value of crimes that involve deception is higher than those involving violence, while those involving violence have a higher prejudicial potential. *Jackson*, 50 S.W.3d at 592 (citing *Theus*, 845 S.W.2d at 881). Temporal proximity favors admission if the past crime is recent and the witness has demonstrated a propensity for running afoul of the law, while if the past crime and charged crime are similar, this weighs against admission because similarity suggests the possibility that the jury could convict on the perception of a pattern of past conduct rather than on the facts of the charged offense. *Id.* at 592–93. When the case involves the testimony of only the defendant and the State's witnesses, the importance of the defendant's credibility and testimony escalates and weighs in favor of admission. *Id.* at 593.

Theft is a crime of deception. *See id.* at 592. Therefore, Meadows's three felony theft convictions had a high impeachment value. *See id.* However, the

5

three theft convictions were also more remote and were similar to the charged offense in that they involved taking property that did not belong to him, weighing against their probative value, even though none of the prior thefts involved violence. *See id.* at 592–93. As the only defense witness, Meadows's credibility and testimony was very important, supporting the admission of the prior theft convictions. *See id.* at 593. We cannot say, on the record before us, that the trial court abused its discretion by admitting Meadows's prior felony theft convictions, particularly when Meadows stated during his direct testimony that he had intended to steal money from the restaurant but that his objective had been to commit theft, not robbery, and the trial court included a lesser-included offense instruction on theft in the jury charge. Because we conclude that the trial court did not abuse its discretion by admitting the three felony theft convictions, we overrule this portion of Meadows's sole point.

## C. Assault-Family Violence Misdemeanor

Meadows argues that his misdemeanor assault-family violence conviction should not have been admitted because he did not open the door to its admission under the false-impression exception.[4] We will assume without

---

[4]This exception

> arises when a defendant testifies and leaves a false impression as to the extent of his prior arrests, convictions, charges against him, or "trouble" with the police generally. In such a case, the defendant is deemed to have "opened the door" to an inquiry into the veracity of his testimony, and evidence of the defendant's prior criminal record is admissible to correct the false impression.

deciding that the trial court erred by admitting this misdemeanor conviction and review the record to determine whether the error had a substantial and injurious effect or influence in determining the jury's verdict. *See* Tex. R. App. P. 44.2(b); *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). An error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

In making this determination, we review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also consider the jury instructions, the State's theory and any defensive theories, whether the State emphasized the error, closing arguments, and even voir dire, if applicable. *Id.* at 355–56.

---

*West v. State*, 169 S.W.3d 275, 278–79 (Tex. App.—Fort Worth 2005, pet. ref'd) (citations omitted).

### 1. Voir Dire

In voir dire, the State asked potential jurors whether they would require seeing the actual alleged deadly weapon, and Meadows's counsel asked about witness credibility assessments and warned the potential jurors that things were not always as they initially appear.

### 2. Opening Statements

In its opening statement, the State described the case as one about terror, violent intimidation, and selfish choices, while Meadows's counsel described the case as one involving a plan to commit theft, staged to look like a robbery.

### 3. Evidence

Lacy Nabors, who had been the manager of the Buffalo Wild Wings on the date of the robbery, testified that she entered the restaurant through the front door around 7:35 a.m. and unlocked the back door for Daniel Holliman, the cook. She stated that it had been a common, widely-known practice among the employees to leave the back door open. Holliman agreed that other employees would have known about leaving the side door unlocked and stated that he had left the door open for other employees who would arrive later.

While Nabors was in the office, Holliman came by to let her know he was there. While Holliman was prepping in the kitchen, he saw a man in a Scream mask, who asked him where the manager was.[5] Holliman told him that the

---

[5]Holliman said that when he first saw the man in the mask, he thought it was a joke until he saw the gun.

manager was in the office; when the man raised his right hand, Holliman saw his gun.

Holliman returned to the office and told Nabors not to freak out. The masked man pointed a gun at them and demanded that Nabors open the safe. Nabors said that he told her that if she did not do what he said, he would blow Holliman's head off and that if she pressed the panic button, he would blow her head off. Holliman did not remember whether the man made any threats.

Nabors opened the safe, took the bag that the man handed to her, and put all of the money—"around a couple of thousand" dollars—in the bag. Nabors said that the man kept his hand around her neck, pushing her down to make sure she would not go anywhere and that he had Holliman on the ground with his knee on Holliman's back. The man then took them to the restaurant's walk-in freezer and ordered them to get into it, get on their knees, face the back wall, and not to make any movements or he would blow their heads off. He then shut the freezer and left.

Nabors said that she feared for her life throughout the encounter and that she and Holliman did not move for five minutes before Holliman pressed the freezer's panic button. Holliman said that they waited to press the panic button in case the man was still out there and that he had feared for his life. They stayed in the freezer until the police arrived. State's Exhibit 1, which the trial court admitted and published to the jury, is the restaurant's surveillance video, which

9

corroborates Nabors's testimony.[6]  After the robbery, Nabors saw David "Tito" Alayon, another Buffalo Wild Wings cook, outside, and she recalled Tito asking her on the previous shift if she was opening the store as manager that day. Nabors said that any of the cooks, including Tito, would know about leaving the side door open.  Holliman said that Tito had not been scheduled to work that day and that he thought Tito had ultimately been fired for stealing a customer's wallet.

Wichita Falls Police Detective John Laughlin testified that police were able to obtain from the surveillance video several images of the robbery suspect removing his mask.  After the suspect's images were disseminated to the media, some of Meadows's acquaintances recognized him and gave statements to the police.  Detective Laughlin, a certified firearms instructor and an armorer who had built and repaired a variety of guns, testified that having reviewed the surveillance video, and based on his training and experience, he believed the suspect to have brandished a semiautomatic handgun.

---

[6]The surveillance video shows Nabors enter the restaurant and then enter the room with the side door and open it; several minutes later, Holliman enters through the side door.  Around fifteen minutes after Holliman's arrival, a man wearing a Scream mask enters through the side door.  In the restaurant office, Nabors works; Holliman enters the office and then leaves again until he and the masked man enter together.  The masked man holds both employees at gunpoint.  He hands Nabors a bag and forces Holliman to his knees, with his hand on Holliman's neck.  Then, keeping Holliman between his legs, the masked man puts his hand on Nabors's neck and keeps the gun trained on her while she opens and empties the safe.  Before the masked man exits the building through the side door, he puts Holliman and Nabors in the walk-in freezer at gunpoint. He removes the Scream mask as he leaves the building.

Meadows admitted that he was the masked man. He testified that Tito had approached him a few days before the robbery, alleging a conspiracy with Holliman and Nabors to steal money from the restaurant. Meadows was to "act out a robbery," making it look as real as possible for the surveillance cameras. Tito picked him up on the day of the robbery, gave him the mask, an item that looked like a weapon,[7] a bag, and additional directions, and told him not to worry about anything.

Meadows said that when they arrived at the restaurant, he put on the mask, and as Tito had told him, the side door was unlocked. He went through, and Holliman led him to the office. Meadows testified that he did not pull out his pretend weapon until he arrived at the office and acted out the "whole entire ordeal." He told Nabors, "[Y]ou know what I'm here for. . . [.] Don't panic." Nabors opened the safe and put the money in the bag.

Meadows denied that he had threatened Nabors or Holliman and said that he told them to give him some time to get away before they called the police. Meadows said that he had intended to steal money from Buffalo Wild Wings but as a theft, not a robbery, and stated, "I didn't threaten anyone in that door. I didn't tell anyone I was going to kill them, blow their heads off or any other form decapitation, hurt, anything, nothing like that. Nobody's harm was ever intended and I would not do that to no one."

---

[7]Meadows said that the item given to him by Tito was a contraption pieced together from a water nozzle spray gun and that it was not a firearm.

11

During cross-examination, Meadows admitted to his prior convictions, said that Tito had pressured him into going along with the plan, and admitted that he had never seen nor spoken with Nabors or Holliman prior to the robbery. He denied that he had told Holliman and Nabors to get on their knees in the freezer or that he had threatened to kill them if they moved. Meadows agreed that he never mentioned Tito during his police interview and that he had lied when he told Detective Laughlin that he had an alibi and that he was not involved in the robbery.

During his redirect examination, Meadows stated that his assault-family violence conviction had involved his stepson, "a pretty good sized guy" with whom he had had a disagreement. Meadows described it as "a wrestling match" that had occurred because Meadows had been "battling an up and down relationship with [his] wife," that he and his stepson "just kind of bumped heads with each other," and that he might have pleaded guilty to it "just to get it over with." The amended information for the offense alleged that Meadows had intentionally, knowingly, and recklessly caused bodily injury to his stepson by choking him.

Detective Laughlin testified as the State's rebuttal witness and explained why he believed Meadows had used a firearm.[8] Detective Laughlin pointed out

---

[8]Specifically, Detective Laughlin indicated that there appeared to be an ejection port, which functions on a semiautomatic handgun to remove an empty casing from the chamber so that the next live round can be chambered into the barrel on the right-hand side of the slide of the receiver. He also stated that it

12

that the weapon's trigger guard and distinct muzzle could be seen from the surveillance video.

## 4. Closing Arguments

The prosecutor's closing argument focused on the parts of Meadows's testimony that were "believable"—that Meadows was at Buffalo Wild Wings and took the money and that Tito was involved—and he argued that the dispute was over whether Meadows had intentionally and knowingly threatened Nabors or Holliman and placed them in fear of imminent bodily injury or death during the robbery and whether he had used a deadly weapon.

Meadows's counsel agreed that the focus should be on Meadows's mental state and pointed out that the jury could convict Meadows of theft because he had already admitted to it. He argued that if Meadows believed that Nabors and Holliman were in on the deal, then he could not have committed robbery or aggravated robbery and that Meadows could have believed what he had been told about staging the robbery was true because the door was open and the people he had been told would be there had been there.

The prosecutor responded that Nabors and Holliman were not involved in Tito and Meadows's plan, that the weapon was a gun and not a spray nozzle,

---

appeared to have the scalloped design used for a good grip on the firearm at the rear of the slide and a rear front-post sight and rear sight on the back of the slide, which are used to aim the weapon.

and that the video showed that this was a violent encounter involving a man sticking a gun in the victims' faces. He did not mention the prior convictions.

### 5. Analysis

As highlighted by both the State and Meadows throughout the case, the primary issues were Meadows's mens rea at the time he committed the theft and whether the item he had brandished during the offense was a deadly weapon in light of the surveillance video, his testimony, and Nabors's and Holliman's testimonies. In contrast, the misdemeanor assault-family violence conviction involving Meadows's stepson arose from a domestic disagreement. Meadows described the incident as "a wrestling match," and the information described it as "choking." Neither description involved the use of a per se deadly weapon, and neither party emphasized the conviction. Therefore, we conclude that, in the context of the entire case against Meadows, the trial court's error, if any, in admitting the assault-family violence misdemeanor conviction did not have a substantial or injurious effect on the jury's verdict and did not affect Meadows's substantial rights. *See King*, 953 S.W.2d at 271. Thus, we disregard the error and overrule the remainder of Meadows's sole point. *See* Tex. R. App. P. 44.2(b).

## III.  Conclusion

Having overruled Meadows's sole point, we affirm the trial court's judgment.

PER CURIAM

PANEL:  MCCOY, GARDNER, and WALKER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  January 9, 2014

15